Matter of Rory H. v Mary M. (2003 NY Slip Op 51600(U))

[*1]

Matter of Rory H. v Mary M.

2003 NY Slip Op 51600(U)

Decided on December 23, 2003

Family Court, Queens County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 23, 2003

Family Court, Queens County
In the Matter of a Custody/Visitation Proceeding RORY H Petitioner, - -
against
MARY M. Respondent.
Docket No.: V - 03549-03

MEGAN TALLMER, J
The parties have cross-petitioned for custody of Dylan, who is two and a half.[FN1] Unlike either of his parents, Dylan is an American citizen. His mother, Mary, a national of Northern Ireland, cannot legally continue to live in this country. Dylan's father, Rory, is an Irish citizen who married a United States citizen two weeks after initiating this proceeding. Rory has a pending application for a green card based upon his marriage. While his application is pending, Rory is permitted to live in the United States.
If both parties legally lived in the United States, this would be an easy decision. Mary stayed home with Dylan and has been his primary caretaker since birth. There is no question that she is a good, caring and responsible mother. Rory is by far the less suitable custodial parent and faces deportation in the next few years because his marriage is a sham.
Because Mary cannot return to the United States, the Court must choose between two onerous alternatives. Either Dylan, an American citizen, will grow up in Northern Ireland with his mother or he will remain in the United States with his father until Rory's green card application is denied. After considering all the evidence and the relevant factors, the Court opts for the lesser of two evils by granting custody to Mary. The Court make the following findings of fact and conclusions of law.
 FINDINGS OF FACT
Rory filed his custody petition on February 24, 2003. He told the Court that Mary, without notice, left early for a planned trip to Northern Ireland and refused to commit to [*2]returning to New York with Dylan. Based on those representations, the Court granted temporary custody to Rory. On April 1, 2003, Mary filed a cross-petition for custody. Rory then brought a Hague Convention proceeding in Northern Ireland and on June 17, Judge Gillen of the High Court of Justice in Belfast ordered that Dylan be returned to New York.
Mary received a special parole from the United States State Department allowing her to come back to New York for the sole purpose of litigating Dylan's custody. On June 9, 2003, the fact finding hearing commenced and was completed on October 15, 2003.[FN2] With the exception of Rory and his wife, the Court finds the testimony of all other witnesses generally credible.
Mary and Rory's relationship prior to 2003
Mary is a national of Northern Ireland and therefore considered a British citizen. She came to New York in 1989; Rory, an Irish citizen, arrived in 1995. The couple met in 1996. Both Rory and Mary overstayed their visitor visas long ago and remained in the United States in violation of immigration laws. Because they are here illegally, neither had a social security number or paid personal income taxes.[FN3]
Together, Mary and Rory formed a construction company that Rory now runs. Mary worked as a bartender and home health aide before she had Dylan and then did some light office work for Rory. She also has secretarial skills.
Five years ago, Mary moved into Rory's apartment. In 1999, Mary bought a home in Northern Ireland. The couple was engaged on New Year's Eve of 2000. After their engagement, the parties purchased property in Northern Ireland in both their names. In 2002, Mary and Rory bought a two-family home in Queens together and moved into it in mid-October. No evidence was offered to explain why the couple never married.
In the fall of 2001, Mary became pregnant with Dylan. The pregnancy was unplanned; after their relationship ended, Rory accused Mary of having gotten pregnant on purpose. Dylan was born May 20, 2002. The first two weeks after Dylan's birth, Rory was very attentive to the baby, although Mary discouraged him from letting Dylan fall asleep on his chest.
After Rory's mother arrived for a three-week visit to help out with the baby, Rory lost interest in Dylan. He had very little interaction with Dylan other than to accompany Mary to doctor appointments. Mary was Dylan's primary caretaker. She was a full time mother and did virtually all the feeding, diaper changing, bathing and dressing.
Dylan was christened on July 14, 2002. Mary's sister Carolyn M. came over from Northern Ireland for six days. She spent all but one day of her visit with Mary. Carolyn was very upset with what she observed in the household. Rory left the house early in the morning and did not come home to eat the dinners Mary prepared. He spent no time with Mary and Dylan. The day of the christening, Mary had to take Dylan with her to set up the reception because Rory was [*3]nursing a hangover. Rory did not talk to Mary on the way to the church. The only time Carolyn saw him holding Dylan was at the ceremony. It appeared to Carolyn that her sister in effect was a single mother.
The events leading up to Mary's inability to return to the United States
The couple's relationship ended December of 2002. Mary made plans to move into an apartment three blocks away in a building owned by her brother. The apartment was not ready to be occupied but Mary was able to store her belongings in the building. The parties agreed that Dylan would live with Mary. Rory concedes that Mary has been a good mother.
In January of 2003, Rory suggested that Mary take Dylan to Northern Ireland to meet their families and to assist her father's recovery from hip surgery. Although the parties had traveled back and forth from New York City to Ireland nine or ten times without incident, all those trips preceded the events of September 11, 2001.
Whenever Mary or Rory returned from Northern Ireland, they flew from Dublin to London and then London to JFK. They followed this routine because in Ireland, the immigration check is done at the departure airport. The parties were concerned that there would be greater scrutiny of their status flying out of Ireland because there relatively are few flights to screen. By contrast, the immigration check for travelers from London to New York City is done at JFK, where thousands of people arrive every day.
Rory purchased tickets for Mary and Dylan to fly to Dublin on February 18. Rory also bought return tickets from Dublin for March 17, but the parties did not agree on Mary's return date. She wished to stay eight weeks; he wanted her to come home after six weeks. The parties applied for a passport for Dylan. When it arrived, Rory initially refused to let Mary have it because he did not want Dylan to be gone for eight weeks. He eventually turned the passport over to Mary.
Before Mary's departure, Rory signed a release for the sale of the couple's property in Northern Ireland. Mary also arranged to sell her own property. Mary netted a profit of approximately $20,000 from the sale of the home she owned with Rory. She sent Rory $10,000, representing his share of the proceeds. Although Rory initially deposited the $10,000 into a bank account for Dylan, he later withdrew that money and has not replaced it.
On Monday, February 10, Rory asked Mary for his annulment papers, saying that his ex-wife needed a copy of them. He pressed Mary for Dylan's birth certificate and social security card, claiming that he needed them to open a bank account for Dylan. Mary told him these documents were with the items she packed for her move.
Mary moved out of the apartment Tuesday, February 11, four days earlier than she planned (7/9 at 45). She took with her Dylan's medical records, her credit card statements, bank statements and statements from the parties' joint checking account. The checking account had only enough money to pay for bills.
Before leaving on her trip, Mary arranged for items purchased in America by her brother Gabriel to be shipped to Northern Ireland. She contracted with a shipping company previously used by Gabriel. Mary included in Gabriel's shipment baby clothes and furniture Dylan had outgrown, a wall unit and dining room set that did not fit in her new apartment and some exercise equipment she no longer used. She planned to give the baby things and exercise equipment away and to sell the furniture.
[*4]
Although Dylan had never spent the night alone with Rory, the parties agreed that he would sleep over on Saturday, February 15. When Mary repeatedly asked Rory where he was going with Dylan, Rory would not answer and told her it was "none of [her] fucking business." Rory called Mary the morning of February 14 and again refused to disclose where he was taking Dylan. He told Mary "you better give me the birth certificate and social security card or you're going nowhere on Monday." That night, Mary found Rory's annulment and divorce papers as well as his army discharge and passport on Rory's night stand.
Rory's behavior made Mary fearful that he would stop her from going to Northern Ireland with Dylan. After speaking with her sister-in-law, Kathleen M. and Rory's brother, Leo H., Mary decided to leave four days early. Although Leo did not advise her to advance her departure, he did not object to her plans. Because she no longer trusted Rory, Mary gave Kathleen M. power of attorney. With Kathleen M.'s assistance, Mary booked a flight that night for herself and Dylan.
Leo picked Mary and Dylan up at Shannon airport. Mary called Rory from Leo's house at 5:30 AM on February 15. When she told Rory she and Dylan were in Ireland, Rory said "you fucking bitch you will regret this for the rest of your life. I'm calling the cops." The entire conversation lasted only a few seconds. Rory was shocked and sick to his stomach by Mary's news.
Mary's sister Carolyn M. picked Mary and Dylan up at Leo's and drove them to Mary's parents' home. When Carolyn M. first saw her, Mary was on the telephone with Rory's mother. While Mary was in Northern Ireland, she visited Rory's parents three times. This required her to travel 300 miles each way. Mary also made a two hour trip to Dublin so that Dylan could see Rory's extended family.
The parties' conduct since the commencement of the custody proceedings
 Rory had the following colloquy with the Court when he filed for custody on February 24, 2003:
 THE COURT: Your concern is that she has abducted the child?
MR. H.: And won't bring him back. I spoke to her. She said she is coming back, but won't give me a specific date.
THE COURT: You spoke to her in Ireland?
MR. H.: Yes.
THE COURT: And she said?
MR. H.: She said she is coming back to New York, but couldn't give me a date or a time. I asked her to sign something to the effect that she is definitely going to come back, and she refused to do that also.
When questioned at trial about his conversations with Mary after she arrived in Ireland, Rory never asserted that Mary would not commit to returning to New York. Even when the Court specifically asked whether Mary said anything about her return plans, Rory did not claim that there was any discussion of Mary's intentions. The Court finds that Mary never made the statements Rory attributed to her and that Rory misrepresented the facts to the Court to gain custody of Dylan.
[*5]
Two days after filing his custody petition, Rory married Elizabeth. He then applied for a green card on the basis that he is married to a United States citizen. Rory is allowed to live in the United States while his application for a green card is pending.
Appearing by her attorney, Mary filed a cross-petition for custody on April 1. On April 8, Mary made her first attempt to return to New York with Dylan. Although Mary's past practice was to fly through London, she was concerned that if she was denied entry at JFK, a friend of Rory's in the Immigration and Naturalization Service ("INS")[FN4] would take Dylan from her. She decided to fly from Shannon Airport because the immigration check is done at Shannon, rather than at JFK. Mary reasoned that if INS refused to let her back into the United States, she would not be separated from Dylan.
When the INS officer at Shannon saw that Dylan had a United States passport, he turned Mary away. Mary then had Kathleen M. mail her an unused British passport. On April 26, Mary tried to fly back to New York through London using that passport. Although she booked a flight both for herself and Dylan, when she got to the airport, there was no ticket for Dylan. Since it was Dylan's passport that led to Mary's previous rejection at Shannon, Mary decided to fly alone. The plan was for Mary's sister Carolyn M. to bring Dylan to New York the next day. Mary flew to JFK but was detained and returned to Ireland.
On April 30, Rory instituted proceedings under the Hague Convention.[FN5] He traveled to Northern Ireland via Canada to appear at the Hague Convention proceedings. A sympathetic supervisor in Canada allowed him to reenter the United States when Rory explained the circumstances under which he went to Northern Ireland.
When he appeared in court on April 11, 2003, Rory acknowledged that his green card application would be nullified if he left the United States without permission. At trial, however, Rory denied knowing what effect an unauthorized departure would have on his application. The Court finds that Rory was well aware of the consequences of his trip to Northern Ireland and flew out of Canada to avoid detection.
At the conclusion of the Hague Convention proceedings, Mary was directed to return to the United States with Dylan. Mary obtained a parole from the State Department that allowed her to reenter the United States for the sole purpose of litigating custody. There is no possibility of Mary's gaining lawful residence in the United States for at least ten years.
The second week of May, Mary was alerted by her sister-in-law that a $5,000 check had been drawn against her Discover Card. When Mary received a copy of the check, she realized that Rory had signed her name to it. Mary did not send the check to Rory, nor had she authorized him to sign it on her behalf.
Mary was required to file criminal charges against Rory as a condition of being reimbursed by Discover Card. Although Rory was arrested, he was released after 24 hours. The [*6]District Attorney advised Mary that she could not proceed with criminal charges unless she was in the United States. Mary did not renew the charges when she returned to New York because Rory's attorney was attempting to have the money returned to her. After the close of the custody hearing, $5000 was returned to Mary but she continues to seek reimbursement for interest fees charged by the credit card company.
Rory testified that in early April, Mary enclosed a signed blank Discover Card check in an envelope with some photographs of Dylan. Rory admitted filling in the amount of the check but denied having signed Mary's name to it. He maintained that Mary sent the check to him to settle bills. The Court rejects Rory's story as wholly implausible and finds that Rory filled out and signed the check without Mary's knowledge or permission and then lied about his actions under oath.
 Since Dylan returned to New York, Rory has been allowed visitation every weekend and every other weekday from 12:30 PM to 6:30 PM., provided he is not under the influence of alcohol. Rory missed his visit with Dylan on September 3. Although he claimed he had meetings that day, he was at a bar from 3:25 PM till 6:30 PM. Rory missed two other visits with Dylan, one due to his work. Rory also failed to appear at a scheduled court session, citing business concerns. While Dylan has been in New York, Mary has run into Rory four times. Twice, he crossed the street to avoid her and once refused to acknowledge her greeting. Another time he kept on walking when Mary called to Dylan.
Rory seeks custody of Dylan because the parties agreed Dylan would be raised in America and because this country offers greater educational opportunities and better health care. Rory plans to buy a building that has a bar and grill. He relocated his office from Brooklyn to the basement of his home and took on additional employees to have more time to spend with Dylan. Although Rory still will have to leave the house on business, Elizabeth and Rory's sister-in-law are available for babysitting. A day care center in the neighborhood also is available. Rory has no relatives living in the United States. He does not want to leave New York because he has a company that employs five people and is married to an American citizen.
Mary intends to live with her parents in a five bedroom bungalow on a farm 20 minutes from Omagh, Northern Ireland. Mary will not have to pay rent and Dylan will have his own room. Mary's sister and brothers live close by with their families, including three children. Dylan will be within a three hour drive of Rory's parents, siblings and cousins, all of whom live in Ireland. He is entitled to free health care and education at a Catholic school. Mary plans to have Dylan attend a day care center while she works part time as a secretary or administrative aide. Her mother and sister-in-law are available to babysit.
Evidence as to Rory's drinking
One of the key questions in this case is whether Rory has an alcohol problem that compromises his fitness to have primary custody of Dylan. Rory agreed to submit to an evaluation for alcohol abuse at the Smithers Center. Rory told Smithers he drinks moderately with rare, if any, episodes of mild intoxication. Based on a three hour evaluation by a physician and on Rory's self reporting as to his alcohol consumption, Smithers concluded that Rory was a moderate drinker with no physical signs of alcoholism.
 Notwithstanding this evaluation, the Court finds there is persuasive evidence that Rory consumes significant amounts of alcohol on a regular, if not daily, basis and has passed out from [*7]excessive drinking. The Court also concludes that before Mary took Dylan to Northern Ireland, Rory gave drinking and socializing in bars priority over spending time with his son. That behavior continues to this day, as evidenced on September 3, 2003 when Rory spent the afternoon drinking in a bar rather than exercising scheduled visitation with Dylan.
Mary had a long-standing concern about Rory's drinking too much and spending too much time in bars. In November of 2002, Mary spoke to Tracy G., manager of a bar Rory regularly visited, to ask how often Rory came in. The next month, Mary told Rory's brother Leo H. she was worried that Rory was drinking too much and staying out too late.
Before Dylan's birth, Rory went to a bar Monday to Friday from 3:30 to 6:45 PM. Towards the end of Mary's pregnancy, Rory promised to cut back on his drinking. For the first few weeks after Dylan's birth, Rory was home in the evenings. After two weeks, however, Rory reverted to his old routine. He left the house at 5:45 AM., when Dylan sometimes was awake. Rory went to a bar at 3:30 PM after work and was not home until 7:30 PM or later. Because Dylan went to bed at about 6:00 PM, Rory had very little interaction with his son.
In the fall of 2002, Mary was upset about Rory's increased drinking. When Rory failed to come home or call Mary on a Saturday night, she took Dylan and stayed in a hotel. The next night she spent at her brother's. Rory made no attempt to reach her until Monday evening, when he called and told Mary "get your fucking ass home or I will go and kick down the door ... don't you dare take my son out of the apartment." When she came home, Mary told Rory she was worried that his drinking was out of control.
Mary's sister and sister-in-law corroborated Rory's excessive alcohol consumption. Kathleen M., a pediatric nurse married to Mary's brother, observed Rory intoxicated about ten times when she came to pick up her children from Mary. Driving home from work at 9:00 PM., Kathleen M. has seen Rory's truck parked outside the bars on Grand Avenue. When Mary's sister Carolyn M. visited for Dylan's christening, she and Mary had to collect Rory from a bar because he drank too much.
Paul Daly and Steven Ola are private investigators hired by Mary. Beginning September 3, 2003, they followed Rory three times a week for three weeks. A report of their observations was admitted into evidence as Respondent's Exhibit G. The investigators saw Rory at or in a bar on three occasions. On September 3, the investigators observed Rory consume nine 12 ounce bottles of Heineken beer over a two and a half hour period and then drive away.
The testimony of Rory's witnesses provides further support for the Court's findings. Rory's wife, Elizabeth, characterized him as a regular at Connie O's who was known to everyone at the bar. Tracy G., the manager of Connie O's, has been friendly with Rory for four years. She works from 12:00 PM to 6:00 PM, Monday to Friday. Rory is at the bar more than three work nights a week, stays between two and four hours and consumes about four beers. No food is served at the bar. Caroline S., a business associate of Rory's, goes to Connie O's on Wednesdays and Fridays. She sees Rory there once a week; he usually leaves the bar between 7:00 and 7:30 PM.
 Further evidence of alcohol abuse comes from Rory himself. According to Rory, he does not drink everyday and does not believe he has a drinking problem. He only occasionally goes to a bar after work. Most evenings, he was home before Dylan's bedtime and had dinner with Mary and Dylan. He explains that the reason he has fallen asleep on the toilet many times [*8]is because it is a habit he developed as a teenager. Rory denies that he was drunk when he fell asleep on the bathroom floor, asserting that he was "sick" from drinking liquor at a company Christmas party.
Rory's refusal to acknowledge the extent of his drinking and its effect on his daily life is characteristic of the denial practiced by alcoholics.[FN6] The evidence establishes that Rory routinely went to bars after work and did not come home before Dylan went to sleep. Rory's report as to the frequency and amount of alcohol he consumes is at odds with the testimony of his own witnesses.
 Rory's absurd explanations for "falling asleep" on the toilet and bathroom floor also indicate that he is in denial. People who do not have an alcohol problem can admit that they have been intoxicated on occasion. Elizabeth, for example, candidly acknowledged that she had too much too drink the night she was arrested for driving while under the influence. By contrast, Rory's stubborn refusal to admit he was drunk when he passed out on the toilet and bathroom floor speaks volumes. Left unacknowledged and untreated, Rory's alcohol problem is likely to get worse [FN7] and to hurt Dylan's development.
Evidence as to Rory's marriage
Elizabeth met Rory two years ago when she was bartending at a sports bar. She saw Rory "once in awhile" on her Thursday day shift. In September of 2002, Rory helped Elizabeth get a bartending job at Connie O's. From September 2002 until December of 2002, Elizabeth saw Rory at the bar on a regular basis. During that period, they never had a date or socialized outside Connie O's. Rory claimed he and Elizabeth first were intimate in December of 2002, the same month his four and a half year relationship with Mary ended.
On February 24, 2003, Rory filed for custody. Two days later, he married Elizabeth at City Hall with Elizabeth's mother and two friends in attendance. Rory then applied for a green card as the spouse of a United States citizen. Rory lawfully may remain in the United States while his application is pending. If Rory's union with Elizabeth is deemed to be a sham entered into for the sole purpose of obtaining a green card, Rory will be deported.
Elizabeth gave blatantly perjured testimony with respect to the bona fides of her marriage. Elizabeth's cross-examination was punctuated by frequent pauses, shrugs and the use of the phrases "I don't know," "I don't remember," "I guess so" and "to be honest with you." Only six months after allegedly becoming intimate with Rory, she was unable to recall a single significant event in their relationship. During her cross-examination, the Court advised Elizabeth of her right to independent counsel because of her exposure to criminal charges.
 The following exchange typifies Elizabeth's testimony:
Q. When was your first date with Mr. Harris?
A. god - I don't know. I - When was our first date? It was never like that. We were always friends. We always talked. I never actually - I don't know, did
 we ever have a date?
 Q. Did you go out to dinner with him?
A. Huh?
Q. Did you ever go out to dinner with him?
A. Sure I have.
Q. When was the first time you went out to dinner with him?
A. God - I really don't know. I don't know.
Q. You said you - know him for two years.
A. Mm-hmm.
Q. Was it in the first year that you met him?
A. That we went out together?
Q. Yeah.
A. No.
Q. So you did not have dinner with him for the first year?
A. No.
Q. Did you have dinner with him in the second year?
A. I assume so, if we only know each other about two years.
Q. Well - We don't want you to assume -
A. Yes.
Q. - we want you to say what you remember
.
A. Yes.
* * *
[*9]
Q. So the question is, when did you first go out to dinner with him? We've narrowed it down to the second year.
A. I would assume - I would say the first, like week of December.
Judge Tallmer: Ma'am when you say, " I would say," or " I assume," you can only testify as to what you know and remember.
A. I don't remember to be honest with you.
Judge Tallmer: Okay. The answer is, "I don't remember."

A. I don't remember.
Elizabeth claimed that she loves Rory with all her heart and knew from the first day she met him that they would always be together. Despite having held a torch for Rory for so long, Elizabeth did not know or could not remember:

1. The first date she had with Rory;
2. How, when and where she first told Rory she loved him;
3. When Rory first told her he loved her;
4. The first time Rory came to her apartment; 5. The date she and Rory first had sexual relations.
Elizabeth acknowledged that:
1. When Rory told her his relationship with Mary was over, he did not indicate he wanted a relationship with her;
2. She never saw Rory outside of Connie O's before December, 2002; 
3. Prior to December, 2002, she never went out for lunch or dinner with Rory;
 
 4. She and Rory never kissed before they first had sexual relations;
 5. She proposed to Rory one week before they got married;
 6. One of the reasons for marrying Rory was that he was subject to deportation. This same concern was why the parties married in such haste;
 7. Although she worked full-time prior to marrying Rory, in March or April she quit working to attend school;
 8. She knew Rory flew to Northern Ireland from Canada because he was not supposed to leave the United States while his green card application was pending.
Two witnesses called by Rory further attest to the bogus nature of his marriage to Elizabeth. Tracy G., the manager of Connie O's, has been friends with Rory for four years and was Elizabeth's former boss. She had no idea that Rory and Elizabeth were involved with each other and was not told about the wedding. Caroline S., a business friend of Rory's who saw him three to four times a week, did not know that Rory and Elizabeth had a romantic relationship or [*10]that they were married.
Evidence as to Immigration Law and Practice
Frank Schorn testified for Mary as an expert on immigration law and practice. Rory did not offer his own expert witness or significantly impeach Schorn. The Court fully credits Schorn's testimony. According to Schorn, a visitor to the United States who overstays her visitor's visa is considered "undocumented." If she overstays more than one year and is detected by INS, she is barred for 10 years from obtaining any type of visa or green card.
 Undocumented persons who formerly were able to enter the United States without difficulty now encounter far greater scrutiny because of the September 11th terrorist attack. This heightened security is in effect at all airports, including London and JFK. A red flag would be raised at any airport if a child with a United States passport is traveling with a parent with a foreign passport.
An undocumented person who marries an American citizen may apply for a green card that allows the person to reside permanently in this country. If a green card applicant leaves the United States without authorization, his application conclusively is deemed abandoned.
When a person applies for a green card based upon marriage to an American citizen, INS investigates the bona fides of the marriage. If INS determines that the marriage was entered into solely to obtain a green card, the application is denied and the applicant faces deportation. A green card may be rescinded if the INS subsequently discovers it was obtained by fraud. Anyone who intentionally submits a false statement to INS faces up to 5 years in jail and a $250,000 fine.
In determining whether their marriage is a sham, INS would consider the following factors: (1) Rory and Elizabeth wed 12 days after Mary left for Ireland and two days before Rory filed for custody; (2) Rory and Elizabeth never dated and Elizabeth could not remember where or when she proposed marriage or first had sexual relations with Rory; (3) Rory married Elizabeth two months after they began a relationship although he never married Mary during a four and a half year period in which they started a business, purchased real property together, got engaged and had a child; and (4) two people close to Rory knew nothing about his relationship with or marriage to Elizabeth.
It takes 24 to 27 months for INS to pass upon an application for permanent residency based on marriage to an American citizen. When the parties are interviewed, they are required to give the date they last entered the United States. If that date differs from the date on the original application, INS is alerted that the applicant left the country without permission and thereby abandoned his application.
 INS initially conducts a 20 to a 25-minute interview with both parties present. If any doubts are raised that the marriage is a sham, INS conducts a far more rigorous interview in which the parties are questioned separately for several hours. INS then compares their answers and looks for discrepancies, similar to the process depicted in the movie "Green Card." Denial of an application may be appealed; the appellate process takes a few months.
The Forensics Report
The forensics report prepared in this case is of limited usefulness to the Court. The examiner goes to great pains to point out that his mental health opinions are based solely on self-reporting of the parties and not on an assessment of the truthfulness of those reports. He [*11]then relates each party's account of their relationship, essentially repeating their testimony at trial.
When the doctor interviewed Mary and Rory, both were respectful and cooperative. Each acted appropriately and showed affection for Dylan during play sessions. Psychological testing detected no significant personality or character disorders either for Rory or Mary. The test results for Rory indicate that he has extreme emotional sensitivity and probably an under controlling of hostile or negative emotions. Rory's score suggests that he is likely to over-interpret Mary's behavior as negative when it might not be.
During his interview, Rory claimed he has six to ten drinks a week. While Rory generally was relaxed at his interview, he appeared nervous when he and Elizabeth were seen together. When Elizabeth reported that she and Rory spend their spare time going to the movies and playing "Scrabble, " the doctor noted that most newlyweds do not make playing "Scrabble" a priority.
The examiner traveled to Ireland to determine the suitability of the environment in which Dylan would be raised if Mary gains custody. He met with several members of Mary's family. All expressed a firm conviction that Rory should play a large role in Dylan's life and that Dylan's needs should come first.
The doctor visited the home where Mary expects to live with her parents. Mary's parents as well as her brother live on a farm approximately 20 minutes from Omagh. The house and farm are spotless, play areas are cordoned off and there are no hazards to children on the property. Mary's father reported that there has been no conflict in the area and that he gets along well with his Protestant neighbors.
 While in Northern Ireland, the examiner visited the preschool and primary school Dylan would attend. He found small class sizes with a religious orientation. There was less technology than in American schools and more of some "hands on" approach. A preschool called "the Creche" is available for working parents. The examiner notes that Ireland has a national health care system and that a full range of sports, social and recreational activities is available in the local vicinity.
The forensics report concludes that both Mary and Rory are adequate care givers and love their child. All other things being equal, the examiner recommends that Dylan be brought up in the United States, as Mary and Rory intended. This opinion is based on the benefits of living in this country, rather than an assessment that Rory is the more suitable custodial parent. The doctor notes that the following three factors would affect his recommendation:
1. Rory would be unfit if he shows evidence of alcohol abuse by regularly consuming large amounts of alcohol or placing his need to consume alcohol over Dylan's needs;
2. If either party attempted significantly to alter the other's relationship with Dylan, that parent should not be given custody.
3. Should Rory and Elizabeth's union be found to be a marriage of convenience, it would be in Dylan's best interests to live with Mary and her extended family in Northern Ireland.
As discussed above, the Court has determined that Rory has a problem with alcohol, consistently gives priority to drinking over the needs of his child and is unfit to be left alone with Dylan while intoxicated. This factor thus weighs against granting Rory custody. The Court also has rejected Rory's claim that by leaving early for an agreed-upon trip, Mary intentionally denied Rory access to Dylan. Accordingly, this factor has no bearing on the custody determination.
[*12]
With respect to the third factor, if the bona fides of Rory and Elizabeth's marriage could not survive cross-examination at trial, it surely cannot withstand scrutiny by INS. Rory's sham marriage eventually will result in his deportation. Rory's bogus union with Elizabeth also deprives Dylan of the benefit of being raised by parents who care about each other, as opposed to two people who essentially contracted with each other to get married.
 CONCLUSIONS OF LAW
The governing standard for deciding a custody dispute is the best interest of the child. Eschbach v. Eschbach, 56 N.Y.2d 167(1982). In determining the child's best interests, the Court is directed to consider any custody agreement between the parties, the quality of the home environment and parental guidance provided by each parent, the ability of each parent to provide for the child's emotional and intellectual development, and the parties' financial status and ability to provide for the child. 56 NY2d at 171-172.
Although the Court finds that Mary did not intend to remain in Northern Ireland with Dylan, it also will consider any additional factors relevant to a relocation decision, as set forth in Tropea v Tropea, 87 NY2d 727, 739-740 (1996). These include, but are not limited to:

each parent's reasons for seeking or opposing the move, the quality of the relationship between the child and his parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the child's life may be enhanced economically, emotionally and educationally by the move and the feasibility of preserving the relationship between the child and the noncustodial parent through suitable visitation arrangements.
If Mary was able to remain in the United States, there is no question that Dylan's best interests would be served by awarding her custody. The parties themselves agreed that Dylan would continue to live with Mary. She has been Dylan's primary caretaker since his birth and has spent only a few nights away from him. Rory concedes that Mary is a good mother and has raised no issues concerning Mary's suitability, other than her immigration status.
By contrast, the Court has serious concerns as to Rory's fitness. Rory never spent a significant amount of time with Dylan before February, 2003. He left very early for work in the morning and spent many nights drinking at bars until past Dylan's bedtime. As Mary's sister Carolyn observed, Mary effectively functioned as a single parent during Dylan's infancy. Even during this trial, it was apparent that Rory gave greater priority to business, drinking and socializing in bars than to spending time with Dylan or appearing in court.
 Other factors arguing against custody are that Rory (1) stole $5,000 from Mary; (2) committed perjury when he [a] claimed that Mary sent him a signed blank check to pay bills; [b] asserted that he and Mary had a conversation in which she refused to commit to returning to New York; [c] denied knowing the consequences of leaving the United States without authorization while his green card application was pending; and (3) is attempting to deceive INS by entering into a sham marriage. Rory has no problem lying under oath or committing criminal acts when it suits his purposes. It cannot be healthy for Dylan to be raised by a man with so little moral fibre.
[*13]
Understandably, Rory's bid for custody of Dylan rests not upon his own fitness but on three arguments: (1) Mary took Dylan to Northern Ireland intending to remain there; (2) by leaving from Dublin rather than London, Mary brought about her detection by INS and (3) it is in Dylan's best interests to be brought up in this country. The Court concludes that only the last ground has any merit.[FN8]
Rory's contention that Mary abducted Dillon to Northern Ireland, intending to remain there, is not supported by the evidence. Rory and Mary discussed taking Dylan to Northern Ireland when Mary's father had surgery. Rory not only agreed to Mary and Dylan's trip, he purchased their tickets. Although Rory wanted Mary to come back earlier than she wished, he agreed to a visit of at least six weeks and never withdrew that consent. Contrary to Rory's misrepresentations to the Court, Mary did not refuse to commit to returning to New York when she spoke with Rory after arriving in Ireland.
Mary made arrangements to live in an apartment in a building owned by her brother when she returned. She stored some of her belongings in the basement of that building and shipped others to Northern Ireland because they did not fit in her new apartment or no longer were useful. Mary spoke with a friend about taking a part-time job and discussed sharing child care with her sister-in-law when she came back to New York. These acts are inconsistent with a secret plan to relocate to Northern Ireland.
Rory argues that Mary's plan to remain in Northern Ireland can be inferred from the fact that Dillon's birth certificate, social security card and medical records were missing from a file cabinet. This contention has no merit. Mary took these items when she moved her belongings out of the home she shared with Rory. As Dylan's primary caretaker, it made sense for Mary to have Dylan's personal documents. Similarly, Mary had to have Dylan's passport to take him on an international flight.
The Court also rejects Rory's argument that Mary's early departure to Northern Ireland without notice to him was indicative of a plan to abduct Dylan. The Court finds that Mary left New York earlier than planned because she had legitimate concerns over Rory's own intentions vis-a-vis Dylan. Mary's fears were based on the facts that Rory initially withheld Dylan's passport, demanded the originals of Dylan's birth certificate and social security card, told Mary "its none of your fucking business" when she repeatedly asked where he was planning to take [*14]Dylan for his first overnight and removed his personal papers from a file cabinet. This conduct gave rise to a reasonable fear that Rory would attempt to prevent or delay Mary's trip to Northern Ireland with Dylan.
 Regardless of Mary's intentions, it remains true that Rory agreed to let Mary take Dylan to Northern Ireland. Both Rory and Mary therefore assumed the risk that INS would detect Mary's illegal immigration status and prevent her from returning. Rory's claim that "Mary has put herself in a situation that nobody else can blame but herself" entirely fails to recognize his own role in bringing about the present unfortunate situation.
In making its custody determination, the Court acknowledges that Mary is not without fault. No doubt there was a better way to for Mary to deal with her concerns than to leave early for Ireland without notifying Rory. Rory understandably was angry and upset that he had been deprived of a good- bye visit. However, Mary's acts did not amount to an "abduction," as Rory maintained throughout this proceeding.
The Court further does not accept Rory's argument that by flying out of Dublin, Mary engineered being denied reentry into the United States. When Mary made her first attempt to fly home, Rory was in possession of a court order giving him temporary custody of Dylan. Rory never refuted Mary's claim that he had a friend in INS who could alert him to Mary and Dylan's arrival at JFK. Mary has been separated from Dylan only two nights since his birth. She reasonably worried that if she flew to JFK, Rory might gain custody of Dylan while she was forced to return to Northern Ireland. The same concerns motivated Mary's decision to leave Dylan with her sister when she made her second unsuccessful attempt to return to the United States.
In any event, Mary's decision to fly from Dublin was not the cause of her detection by INS. The Court credits the expert testimony of Frank Schorn, Esq. that after September 11th, all airports are subject to heightened scrutiny and that Dylan's United States passport would raise a red flag anywhere. Thus, even had Mary flown from London, her illegal status invariably would have been detected by INS. Mary's rejection both at Shannon Airport and JFK Airport support Mr. Schorn's conclusion. Once Mary left the United States, the refusal to readmit her was a foregone conclusion, no matter which airport she used.
Having rejected Rory's claim that Mary brought about Dylan's separation from his father, the only remaining ground for denying custody to Mary is that Dylan should have the benefits of living in the United States. Obviously, it is preferable for an American citizen to enjoy the many gifts of this country. However, Dylan's right to be raised in the United States is only theoretical if neither of his parents is permitted to live here. The Court is persuaded that Rory's application for a green card will be denied because (1) his marriage to Elizabeth is bogus and/or (2) he abandoned his application by leaving the United States without authorization.
As to the first of these, the timing of Rory's wedding to Elizabeth  only two weeks after Mary's departure and two days before filing for custody itself raises questions whether the marriage is illusory. Elizabeth's incredible, almost comical, testimony makes plain that her marriage was based not on mutual love but on Rory's desire to remain in this country and gain custody of Dylan. That Elizabeth quit her full time job shortly after marrying Rory strongly suggests a quid pro quo for providing Rory with a means to avoid deportation.
Even if his marriage to Elizabeth was bona fide, Rory abandoned his application as a [*15]matter of law when he left the United States without permission and flew to Northern Ireland in connection with the Hague Convention proceedings. Both Rory and Elizabeth were well aware of the consequences of their trip and flew from Canada in order to evade the prohibition against leaving the United States. Whatever his motives, by making an unauthorized trip outside the country, Rory abandoned his green card application.
The Court thus is convinced that Rory's application will be denied and that he will be forced to leave the United States when his appeals are exhausted. Rory and Dylan then will have relocate to Northern Ireland but it will be far more difficult for Dylan to be integrated into a new environment at age four or five than it is now.
Although Dylan will miss the advantages of growing up in the United States, his new home offers many pluses. He will be on a farm surrounded by Mary's family, including cousins. He also will be able to visit Rory's siblings and parents regularly. Free medical care and schooling will be provided to him and he will have access to sporting and social events. Although he may not enjoy the same prosperity as he would living with Rory, Mary will live rent-free with her parents and plans to work part-time. In addition, Mary will have support payments from Rory. All things considered, Northern Ireland will provide Dylan with many opportunities he would not enjoy here.
 By contrast, Rory has no family whatsoever in America. Rory's business obligations during the trial were too pressing to allow him fully to exercise visitation with Dylan or attend court. The Court has no reason to believe that if granted custody, Rory would alter his past practice of spending more time at work and at bars than with his son. Dylan's care inevitably would be left to strangers or to Rory's "wife."
The Court also takes into account that when she was in Ireland, Mary recognized that it was important for Dylan to spend time with Rory's family. She went to considerable lengths to insure that all members of Rory's family had access to Dylan. Mary's efforts were not reciprocated; when she saw Rory with Dylan, Rory ignored or rebuffed her. Rory has failed to demonstrate that he would promote Dylan's relationship with his mother or her family if he is given custody.
The Court does not doubt that Rory loves Dylan and understandably is upset that he has been separated from Dylan these last few months. However, Rory's bid for custody seems to be driven as much by the desire for control and revenge as affection for Dylan. Rory is free to return to Ireland at any time and have complete access to his child. It is his choice to remain here and attempt to gain citizenship through a patently sham marriage.
Mary, on the other hand, is a good mother who appears genuinely anguished over her inability to return to the United States and the separation of Rory from his son. She and her family are committed to promoting Dylan's relationship with Rory. Balancing all these factors, the Court concludes that it is in Dylan's best interests that he remain in his Mother's custody in Northern Ireland and that Rory be given visitation for six weeks in the summer and a week at Easter and Christmas. Once Dylan is old enough to travel alone, his visits with Rory should be expanded.
Attorney's Fees
Mary's attorney has applied for reimbursement of his fee. Rory's counsel does not dispute either the quality or quantity of legal services rendered to Mary but claims that it is inappropriate [*16]to award attorneys' fees in this case. A hearing is necessary to determine the parties' relative financial positions and other relevant factors. Madden v. Cavanaugh, 307 AD2d 266, 267 (2d Dept. 2003); Patterson v. Patterson, 302 AD2d 507 (2d Dept. 2003); Kiprilova v. Kiprilov, 255 AD2d 362 (2d Dept 1998). Inasmuch as the Court is about to leave Family Court, Mary's application respectfully is referred to Court Attorney Referee Seiden.
This constitutes the decision and order of this Court.
 ENTER:


MEGAN TALLMER,
 JUDGE, FAMILY COURT - QUEENS
DATED: JAMAICA, NEW YORK
 December 23, 2003
Decision Date: December 23, 2003
Footnotes

Footnote 1:For ease of reference, the Court will use the first names of the parents and child. References to the hearing minutes and the forensics report have been deleted for publication.

Footnote 2:The fact finding hearing repeatedly was adjourned due to the unavailability of the Court, counsel and witnesses (some of whom came from abroad), as well as summer vacations and preparation of the forensics report.

Footnote 3:Mary invoked her Fifth Amendment right against self incrimination when asked whether she paid income tax and whether she deposited her brother's unemployment checks into a joint account. The Court draws an adverse inference that Mary, like Rory, did not pay income taxes. 

Footnote 4:As of March 1, 2003, the former Immigration and Naturalization Service (INS) was abolished and its functions and units incorporated into the Department of Homeland Security. For purposes of this decision, the agency is referred to as "INS." 

Footnote 5:Hague Convention on the Civil Aspects of International Child Abduction, done Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T. S. 89, reprinted in 51 Fed. Reg. 10.

Footnote 6:The National Council on Alcoholism cites denial as one of the chief characteristics of an alcoholic. National Council on Alcoholism and Drug Dependence (NCADD), The Disease of Alcoholism, at http://www.ncadd.org/pubs/diseaseinside.html. 

Footnote 7:"The disease is often progressive and fatal." Id. at p.2.

Footnote 8:There is a disturbing subtext to Rory's arguments in this proceeding. Counsel essentially asks the Court to find that Mary engaged in wrongful conduct by arranging to be denied reentry into the United States. The fact, however, is that both Rory and Mary lived here illegally for many years and that Mary's rejection by INS was pursuant to immigration law. A court of law cannot premise a finding of parental alienation upon Mary's failure to perpetuate her unlawful status. Similarly, Mary's complaint to the authorities that Rory forged a $5,000 check cannot be a basis for denying her custody.
This theme is repeated with respect to Rory's pending green card application. Counsel repeatedly suggested that Rory's green card application would be approved if no one alerted INS to Rory's unauthorized departure from the United States and Elizabeth's perjured testimony. An award of custody to Rory cannot be based on the likelihood that he and Elizabeth will be more successful in deceiving a federal agency than the Family Court.